**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:16-cv-01329-RBJ

VIOLETA SOLIS,
CESAR SALAZAR,
EDGAR CEBALLOS,
AARON SALAS,
HILDEBERTO ALDECO BALTAZAR,
JUAN RAMON RODRIGUEZ,
ADRIANA LIRA,
NANCY GUTIERREZ,
BEATRIZ MIRAMONTES,
and those similarly situated;

    Plaintiffs,

v.

THE CIRCLE GROUP, LLC,
JAVIER MARTINEZ DRYWALL, LLC,
GULF COAST CONSTRUCTION, INC.,

    Defendants.

---

**UNOPPOSED APPLICATION FOR FEES AND COSTS**

---

Through the undersigned counsel, Plaintiffs apply[1] for attorney's fees and costs from the common fund established through the class settlement. The parties have separately moved for final approval of the settlement. ECF Doc. 157.

## I.   INTRODUCTION

Plaintiffs in this case are represented by two small legal organizations. Lowrey Parady LLC

---

[1] Plaintiffs have conferred with Defendant, The Circle Group, LLC, which does not oppose this application.

("LP" or "Lowrey Parady") is a boutique Denver law firm that specializes in employment law and representation of employees in discrimination and wage-and-hour litigation. Lowrey Decl. at ¶ 3. Towards Justice is a small Colorado-based non-profit organization that provides access to justice for low-wage workers and represents workers in litigation to address systematic labor market injustices.[2] Seligman Decl. at ¶ 3; Hood Decl. at ¶¶ 1-7.

Lowrey Parady and Towards Justice are Plaintiffs' counsel in this case. They apply here for an award of $192,180.00 in attorney's fees, or 30% of the class settlement amount, and $27,479.21 in costs for a total cost and fee award of $219,659.21, resulting in an estimated $403,940.00 remaining for the class, depending on the costs of settlement administration.[3]

## II.   ARGUMENT

### A. Standard

The Tenth Circuit has approved of two methods for calculating reasonable attorney's fees in class actions. First, under the "lodestar plus" method, class counsel can recover its lodestar plus a multiplier to account for the risks of taking the case without a guaranteed fee. *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994); *Tennille v. W. Union Co.*, 2013 WL 6920449, at *4 (D. Colo. Dec. 31, 2013). Second, in cases resulting in a common fund, class counsel can recover under a "percentage of the fund" method. *Gottlieb v. Barry*, 43 F.3d at 482. While either method is permissible, the Tenth Circuit has expressed a "preference for the percentage of the fund method in common fund cases." *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995).

---

[2] Throughout this application for fees, Towards Justice and Lowrey Parady are sometimes referred to as "Counsel."

[3] Per the Motion for Final Approval, the parties will notify the Court if for any reason the total amount available to the class falls below $402,000. ECF Doc. 157 at 2.

To determine a reasonable fee under the percentage of the fund method, the court should consider the following factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the profes-sional relationship with the client; and (12) awards in similar cases.

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 455 (10th Cir. 1988). "[A] court may assign different relative weights to the factors—that is, none of the factors is inherently equiponderant, preponderant, or dispositive." *Stalcup v. Schlage Lock Co.*, 505 F.Supp.2d 704, 705-06 (D. Colo. 2007).

## B. Common Fund Factors

### 1. Time and Labor Involved

One of the most important factors in the percentage of the fund analysis is the time and labor involved in litigating the case. This consideration is quantified by the "lodestar"—the number of hours that class counsel invested in the case multiplied by a reasonable hourly rate. Even when employing a percentage of the fund analysis, courts frequently "cross check" the requested award against the lodestar to ensure that the award does not result in a windfall to class counsel. *Anderson v. Merit Energy Co.*, 2009 WL 3378526, at *4 (D. Colo. Oct. 20, 2009).

Lowrey Parady reports a total lodestar of $299,435.10 and a lodestar of $255,575.10 for the wage claims subject to the class settlement based on (1) extensive work performed by Attorneys Sarah Parady and Mary Jo Lowrey investigating the facts, engaging in extensive motions practice,

and reviewing approximately 32,000 pages of documents to establish the extent of lost wages and missing overtime premiums, Parady Decl. at ¶ 5; and (2) work performed by Lowrey Parady paralegals who helped with filings and organized and managed the wide array of documents involved in this litigation. Parady's and Lowrey's reasonably rates are $350.00 per hour. Parady Decl at ¶ 4; Lowrey Decl. at ¶ 4. Lowrey Parady's paralegal rate is $150.00 per hour. Lowrey Decl.

Towards Justice reports a lodestar of $157,675.00, based on extensive work performed by Attorney David Seligman investigating relevant facts, performing research and drafting pleadings on class and conditional certification issues, coordinating with nine Named Plaintiffs and several opt-in Plaintiffs, and working toward a fair and reasonable settlement. Seligman Decl. at ¶ 6. Towards Justice also dedicated substantial resources to translation of communications and documents for Spanish-speaking clients and class members. Those hours are not included in Towards Justice's lodestar. Hood Decl. at ¶ 9. Seligman's reasonable hourly rate is $350.00 per hour. Seligman Decl. at ¶ 4; Hood Decl. at ¶¶ 10-12.

Courts typically approve "multipliers rang[ing] from one to four [times counsel's lodestar] depending on the facts, with many courts awarding multipliers larger than four on case-specific grounds." *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *4 (D. Colo. Apr. 28, 2017). In this case, Counsel reports a total lodestar of $413,250.00, which does not include time that Lowrey Parady dedicated to the prosecution of the Named Plaintiffs' discrimination claims. Counsel, thus, applies for a fee that is ***less than half*** their total lodestar.

2. **Novelty and Difficulty of the Questions**

As courts in this District have observed, even the mine-run wage-and-hour case involves various complexities not present in general commercial litigation. *Whittington v. Taco Bell of Am.,*

*Inc.*, No. 10-CV-01884-KMT-MEH, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013). And this case is hardly mine run. Counsel has had to contend with two principal defenses: first, that Plaintiffs and the Class are not "employees" as a matter of federal and state law, ECF Doc. 45, and second, that Defendant Circle Group is not an "employer" as a matter of state and federal law, ECF Doc. 59.

The "joint employer" issue raised several important and sometimes novel questions. Circle Group's defense to liability for the denial of lawful wages and overtime premiums depends on a common practice in the construction industry that—as far as Counsel is aware—has not been litigated in the District. Subcontractors frequently contract out their labor to other subcontractors, sometimes called "labor brokers," that provide nothing to a project except labor. Too often, labor brokers deny their workers legal wages and overtime premiums, with those cost savings passed on to the subcontractor.[4] The labor brokers are often judgment-proof, fly-by-night operations—as seems to have been the case in this case considering Gulf Coast Construction's prompt declaration of bankruptcy following the filing of the lawsuit[5]—while the subcontractor, which is an ongoing operation, frequently can deny responsibility because it does not have a direct contractual relationship with the workers. The practice is widespread and largely unpoliced. State regulators now acknowledge that in Colorado there is no "effective regulation" of the industry. *See Colorado Wage Complaints Surge*, note 3, *supra*.

In this case, Circle Group, unlike any of the other Defendants, has the funds to compensate

---

[4] *See generally* Jerd Smith, *Colorado wage complaints surge amid claims of payroll fraud, abuse of workers,* Boulder Daily Camera, April 23, 2016, *available at* http://www.dailycamera.com/boulder-business/ci_29802278/wage-complaints-surge-amid-labor-protests-over-claims. ("*Colorado Wage Complaints Surge*").

[5] *In re Gulf Coast Construction*, 16-61905 (Bankr. N.D. Ga.).

workers for unpaid wages and overtime premiums, but it has adamantly denied that it had an employer relationship with the Class. ECF Doc. 59 (Circle Group motion to dismiss). Counsel was able to overcome that defense, at least at the motion to dismiss stage, because of the extensive investigation that they had performed relating to Circle Group's day-to-day involvement in the employment of the Class and Circle Group's relationship with the labor brokers that cut paychecks to the Class during its employment at the SkyHouse Denver site. ECF Doc. 132. That investigation continued after the Court denied Circle Group's motion to dismiss and included extensive document review of over 32,000 pages of records and depositions in Denver and at Circle Group's headquarters in Atlanta. Parady Decl. at ¶ 5.

The "joint employer" defense also raised at least one critical legal question. Before this case, there had not been any precedent establishing that workers could recover under a "joint employer" theory under the Colorado Wage Claims Act against employers that did not have a direct employment relationship with them. ECF Doc. 132 at 7. Plaintiffs convinced the Court that such liability could attach. *Id.* That victory was critical to the class settlement obtained here. Liability under state law for unpaid wages is critical to protecting the rights of low-wage workers—and particularly low-wage, immigrant workers—because it allows the plaintiffs to use the opt-out procedures of Fed. R. Civ. P. 23 as opposed to the opt-in procedures of the FLSA.[6] In this case, by

---

[6]
> [E]ven when workers actively wish to join in the lawsuit and are willing to put a bit of time and attention into it, the opt-in process can chill them from exercising their rights. Employees fear retaliation for affirmatively taking positions adversarial to their employers. These chilling effects burden some communities more than others. . . . [O]ne set of studies concluded that opt-in rules tend to 'screen out' low-income people of color from participation. Undocumented immigrant workers face more risk than anyone else: not only do they run the chance of being

withstanding Circle Group's motion to dismiss on a novel and untested legal issue, Counsel was able to pursue Rule 23 certification against Circle Group.

Additionally, Counsel briefed several novel legal issues related to the proper standard for certification under § 216(b) of the FLSA. ECF Doc. 82 (minute order requiring the parties to submit briefing regarding the "procedure adopted by Judge Kane in *Turner v. Chipotle Mexican Grill, Inc.*, 123 F.Supp. 3d 1300 (D.Colo. 2015)"). While the Court declined to adopt a new standard for FLSA certification, that briefing illustrates the complex issues at stake in this case regarding the standards for certification. *See, e.g.*, ECF Doc. 99 (Plaintiffs' briefing regarding FLSA opt-in process).

Finally, the Gulf Coast Construction bankruptcy in Georgia has added another layer of complexity and novelty to this case. In most wage-and-hour cases, the defendant has access to relevant payroll records. In this case, Circle Group did not. Instead, to recover many of the documents that have been critical to identifying damages for the Class and providing notice to absent Class members, Counsel has had to use the subpoena process available within the bankruptcy proceedings in Georgia. That required developing expertise and expending resources that are not generally required in wage-and-hour cases. Seligman Decl. at ¶ 6; Parady Decl. at ¶ 5.

3. **The Skill Requisite to Perform the Legal Service Properly**

This litigation has called for a high degree of skill from Plaintiffs' Counsel. It has raised

---

fired, but they also must contend with retaliatory reports to immigration authorities that might lead to deportation.

George A. Hanson, E.E. Keenan, *Lifting All Boats: The Case for Wage and Hour Enforcement in Recessionary Times*, Kan. J.L. & Pub. Pol'y, Spring 2010, at 454, 466 (internal quotation marks omitted).

several important legal issues regarding "joint employer" liability and the FLSA certification process. And it has required extensive factual investigation regarding the nature of the employment relationship and instances of discrimination and hostile work environment. Parady Decl. at ¶ 5.

The case has also presented unique challenges because of the client population. Some of these challenges arose from the fact that most of the Class (and all but two of the nine Named Plaintiffs) are monolingual Spanish speakers. Because of their resources and Spanish-speaking skills, Counsel were able to maintain their relationships with clients, investigate wage-and-hour practices and discrimination, and counsel clients on complex issues related to pursuing and settling these claims on a classwide basis. Seligman Decl. at ¶ 6.

Investigation and client counseling was complicated further by of the difficulties of representing immigrant workers. Particularly in the current political climate, immigrant workers are often afraid to come forward in cases involving the denial of lawful wages.[7] In this case, fears of immigration consequences or retaliation—whether or not they were justified—required Counsel to have extensive conversations with clients and Class members regarding their rights. Seligman Decl. at ¶ 6(b). That required patience, hardwork, and sensitivity to diverse experiences and cultural backgrounds.

Further, Counsel has employed their skill and expertise in using the class action device to benefit low-wage workers to obtain lost wages for as many workers as possible. Some of that skill and expertise has involved legal issues regarding class and collective action certification. And some has required Counsel to research and investigate effective claims processing techniques.

---

[7] Eric Cortellessa, *How Trump Made Wage Theft Routine: Undocumented Immigrant Workers Now Fear Reporting Their Victimization to the Authorities,* American Prospect, June 5, 2017, *available at* http://prospect.org/article/how-trump-made-wage-theft-routine.

While the class action device can offset some of the legal obstacles that timid and underinformed workers might have in vindicating their rights, class certification or even a classwide settlement does not on its own ensure that workers are able to recoup their lost wages. The claims process can itself be fraught for immigrant workers who may fear that there will be consequences for claiming lost wages recovered through class actions that clearly cover them. For this reason, Counsel has worked diligently with a class administrator in Massachusetts that specializes in class actions involving immigrant workers to establish procedures that encourage as many class members as possible to make claims on the class settlement. Seligman Decl. at ¶ 6(f). Even at this early stage in the settlement administration process—with months remaining in the claims period—over 25% of class members have submitted claim forms. Relative to the 10-20% opt-in rate in FLSA collective actions,[8] that figure is substantial.

4. **The Preclusion of Other Employment**

The resources and time that Counsel have dedicated to this case have created opportunity costs for both Towards Justice and Lowrey Parady. While Towards Justice receives hundreds of complaints of wage theft in Colorado every year, it has only two lawyers primarily responsible for litigating, and it is able to litigate only a small fraction of the cases that come through its doors. Seligman Decl. at ¶ 3; Hood Decl. at ¶¶ 1-7. Particularly in light of the time Towards Justice dedicated to investigating the factual and legal issues in this case, participating in discovery, briefing legal questions, and working with nine Named Plaintiffs, several opt-in Plaintiffs, and hundreds of Class members, it had to turn away several cases that it might otherwise have litigated.

---

[8] Andrew C. Brunsden, *Hybrid Class Actions, Dual Certification, and Wage Law Enforcement in the Federal Courts*, 29 Berkeley J. Emp. & Lab. L. 269, 294 (2008).

Those opportunity costs create a real financial toll for Towards Justice. While attorneys at Towards Justice do not personally and directly benefit from attorney's fees awarded in litigation, those fees are critical to keeping Towards Justice's doors open and allowing it to maintain its robust access to justice program. Seligman Decl. at ¶ 3.

LP is a small litigation boutique that, until recently, employed only two lawyers and one paralegal. During many months of this litigation, one of those attorneys was out from work on maternity leave, meaning that during that period, LP had only *one* lawyer who dedicated a large percentage of her time to this case. Lowrey Decl. at ¶ 6. During this litigation in which LP has invested hundreds of hours investigating claims, drafting pleadings, and performing extensive discovery, LP has had to turn away several cases that it would otherwise have had the capacity to litigate. Parady Decl. at ¶ 5.

5. **Whether the Fee is Fixed or Contingent**

Counsel pursued this case on a contingency fee basis, Seligman Decl. at ¶ 2, and thus risked not recovering anything for their work. "[C]ontingency fees provide access to counsel for individuals who would otherwise have difficulty obtaining representation. . . transfer a significant portion of the risk of loss to the attorneys taking a case." *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 245-46 (4th Cir. 2010). "Access to the courts would be difficult to achieve without compensating attorneys for that risk." *Id.* In this case, "Class Counsel would not have recovered any of their fees and out-of-pocket costs had they not obtained a settlement or prevailed at trial. This factor thus weighs in favor of the requested fees because Class Counsel assumed significant risk of nonpayment when they agreed to represent Named Plaintiffs on a contingency fee basis." *Shaw v. Interthinx, Inc.*, No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *7 (D. Colo. Apr.

22, 2015).

### 6. The Amount Involved and the Results Obtained

Counsel refers the Court to its Motion for Final Approval, which includes an extensive discussion of the results obtained for the class. ECF Doc. 157 at 5-6. Even discounting all the fees and costs that Counsel applies to recover here, the Class will still recover more than the total lost wages and overtime premiums that Plaintiffs' expert estimates the class is owed.

### 7. Experience, Reputation, and Abilities of the Attorneys

Counsel has wide experience litigating cases on behalf of workers. They have litigated or are litigating several cases on behalf of workers in federal and state courts in Colorado, including certified class or collective actions on behalf of tens of thousands of immigrant detainees,[9] thousands of childcare providers,[10] and hundreds of cleaning technicians.[11] Seligman Decl. at ¶¶ 3-4. Counsel from LP and Towards Justice have written extensively for national audiences on issues related to class actions on behalf of workers and consumers. Seligman Decl. at ¶ 4; Parady Decl at ¶ 3. And LP and Towards Justice have both received awards and other recognition for their work. Seligman Decl. at ¶ 3; Parady Decl. at ¶ 3; Lowry Decl. at ¶ 3.

### 8. Time Limitations Imposed by the Client or the Circumstances

This case scheduled was for trial in October of this year, which required Counsel to accelerate their discovery work and motions practice with the aim of certifying Rule 23 and FLSA

---

[9] *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 262 (D. Colo. 2017) (certifying Rule 23 class).
[10] *Beltran, et al. v. Interexchange, et al.*, 14-cv-0307, ECF Doc. 535 (D. Colo. March 31, 2017) (certifying FLSA class).
[11] *Avendano v. Averus, Inc.*, 14-01614, ECF Doc. 92 (D. Colo. Sept. 29, 2016).

§ 216(b) classes by that date. Because of those time pressures, this case often took priority over counsel's other work. Seligman Decl. at ¶ 6(f).

9. **The Undesirability of the Case**

While instances of wage theft abound in Colorado and around the country, it is often difficult for victimized workers to obtain legal representation. This case illustrates the risks for attorneys of pursuing this litigation. While upon initial investigation it may have seemed like there was ample evidence to pursue a wage-theft claim against Gulf Coast Construction, that entity quickly declared bankruptcy. Through aggressive and extensive investigation, Counsel was able to mount viable class action claims against entities that have the resources to resolve the Class's claims for unpaid wages, but were it not for that work, this case may have ended up like far too many wage-theft cases—with a finding of liability against a judgment-proof defendant that cannot afford to provide restitution to harmed workers, let alone the lawyers representing them.[12]

10. **Awards in Similar Cases/The Customary Fee**

Professor Scott Moss from the University of Colorado Law School has submitted a declaration stating that Counsel's requested fees are reasonable. ECF Doc. 57-3 at ¶ 4 (Moss Declaration).

Further, compared to similar common fund cases, an attorney's fee award of 30% of the common fund is modest. *Hoffman v. Poulsen Pizza LLC*, No. 15-2640-DDC-KGG, 2017 WL 25386, at *6 (D. Kan. Jan. 3, 2017) (33.3% award); *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *2 (D. Colo. Apr. 22, 2015) (39% award); *Whittington v. Taco Bell of Am., Inc.,* 2013 WL 6022972,

---

[12] Nat'l Employment Law Proj., *Hollow Victories: The Crisis in Collecting Unpaid Wages for California's Workers*, June 27, 2013, *available at* http://www.nelp.org/publication/hollow-victories-the-crisis-in-collecting-unpaid-wages-for-californias-workers/.

at *6 (D. Colo. Nov. 13, 2013) (33.3% award); *Lucken Family Ltd. Partnership, LLLP v. Ultra Resources, Inc.,* 2010 WL 5387559, at *5–*6 (D.Colo. Dec. 22, 2010) ("The customary fee awarded to class counsel in a common fund settlement is approximately one third of the total economic benefit bestowed on the class."); *Vaszlavik v. Storage Technology Corp.,* 2000 WL 1268824, *4 (D.Colo. Mar. 9, 2000).

It is a particularly modest award considering the time and resources that Counsel has dedicated to this case. *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1154 (D. Colo. 2009) ("Converted to an hourly fee, this award leads to payment of over 1,623.00 dollars for each hour spent by any lawyer on the lead counsel team, and for every hour spent by other professionals and support staff on lead counsel's team."). Courts frequently award attorney's fees that include "multipliers" on the attorneys' lodestars. *Mishkin v. Zynex, Inc.*, 2012 WL 4069295 at *2 (D.Colo. Sep. 14, 2012) (collecting District of Colorado cases approving multipliers ranging from 2.5 to 4.6). In this case, Counsel requests a fraction of their lodestar.

**11. The Nature and Length of the Professional Relationship with the Clients**

"Unlike corporate clients, who may need future legal services from their counsel, the likelihood that many class members will be seeking additional representation from Class Counsel is slim. Moreover, the wage claims asserted in this case do not lend themselves to continuous, long-term attorney-client relationships. This factor thus weighs in favor of the requested fee award." *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *7 (D. Colo. Apr. 22, 2015).

**C. Costs**

Courts may award reasonable costs in addition to any amounts awarded as attorney's fees as a percentage of the common fund. *See, e.g.*, *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *8

(D. Colo. Apr. 22, 2015); *Whittington v. Taco Bell of Am., Inc.*, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013).

In addition to the 30% attorney fee award, Counsel apply for their costs of $ 27,479.21. These costs include the costs of discovery, including depositions in Atlanta, Georgia, and expert costs that allowed Counsel to estimate the Class's lost wages, substantially facilitating a fair and reasonable settlement in this case. Seligman Decl. at ¶ 7; Lowrey Decl. at ¶ 7.

These costs are reasonable and were critical to Plaintiffs' obtaining an adequate settlement in this case. Additionally, the costs on their own amount to 4.2% of the Class settlement. Together with the requested attorney's fees, they amount to 34.2% of the settlement. *Whittington v. Taco Bell of Am., Inc.*, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) (approving costs and fees that, together, totaled 39% of the class fund).

### III. CONCLUSION

For all the above reasons, the Court should grant Plaintiffs' application for attorney's fees and costs and award Plaintiffs' counsel $192,180.00 in attorney's fees, or 30% of the class settlement amount, and $27,479.21 in costs for a total cost and fee award of $219,659.21.

Respectfully Submitted,

/s/ *David H. Seligman* ___
David H. Seligman
Alexander Hood
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-248-8426
Fax: 303-957-2289
Email: david@towardsjustice.org

Sarah J. Parady
Mary Jo Lowrey
Lowrey Parady, LLC
1725 High Street, Suite 1
Denver, CO 80218
Tel. (303) 593-2595, Fax (303) 502-9119
sarah@lowrey-parady.com
maryjo@lowrey-parady.com

15

**Certificate of Service**

I hereby certify that on November 28, 2017 I served a true and correct copy of the forgoing on all parties that have appeared pursuant to F.R.C.P. 5.

 s/*David H. Seligman*

David H. Seligman